UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-60564-CIV-DIMITROULEAS/SNOW

GERALD McDONALD ROBINSON,

     Plaintiff,

     vs.

ANDREW SAUL,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on Plaintiff's Complaint seeking judicial review of a final decision of the Social Security Administration denying the Plaintiff's application for Supplemental Security Income (SSI) benefits. The Complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et seq., and was referred to United States Magistrate Judge Lurana S. Snow for a Report and Recommendation.

## I. PROCEDURAL HISTORY

The Plaintiff filed an application for SSI benefits on March 14, 2017, with an amended alleged disability date of March 14, 2017 as a result of back pain, epilepsy, depression and other impairments. (R: 17, 52, 227) The application was denied initially and upon reconsideration. The Plaintiff then requested a hearing, which was held before Administrative Law Judge James Cole Cartledge on April 29, 2019. The Administrative Law Judge (ALJ) found that the Plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council denied the

Plaintiff's request for review on January 31, 2020.  The Plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

The Plaintiff was born on January 25, 1967 and left school in the 11th grade.  He worked as a longshoreman, a warehouse custodian and a roofer.  In 2007, the Plaintiff fell two stories face down from a scaffold.  (R:43-45, 207)

The medical record reflects that an MRI of the Plaintiff's lumbar spine was performed on September  20, 2016.  It reflected multifactoral degenerative changes, worst at the L4-L5 level where there was moderate canal stenosis and moderate left neuroforaminal narrowing.  The findings were similar to those reflected on an MRI of the Plaintiff's lumbar spine performed on June 20, 2015.  (R:354)

On November 29, 2016, the Plaintiff presented to Howard B. Reinfeld, M.D., complaining of chest pain, lower back pain, dyspnea, syncope/history of seizures and depression.  Dr. Reinfeld noted that the Plaintiff had a history of mitral valve disorder, alcohol abuse, dizziness, syncope, hypertension, liver disease and hyperlipidemia.  Physical examination revealed full motor strength in the Plaintiff's upper and lower extremities and full range of motion in the neck, but tenderness in the liver area.  An EKG was performed in Dr. Reinfeld's office in response to the Plaintiff's complaints of chest pain.  The doctor referred the Plaintiff for pain management to treat his lower back pain.  He instructed the Plaintiff to continue respiratory therapy for COPD and to quit smoking.  (R:398-99)

On February 22, 2017, the Plaintiff returned to Dr. Reinfeld, complaining of back pain and left-sided headache.  Physical examination resulted in the same findings as on the Plaintiff's November 2016 visit.  Dr. Reinfeld referred the Plaintiff

to a specialist for consideration of back surgery and ordered a CT scan of the Plaintiff's brain. ( R:492-93)

On July 7, 2017, the Plaintiff completed a Supplemental Seizures Questionnaire in which he reported experiencing an average of one seizure per month for the preceding six months.  On July 18, 2017, the Plaintiff completed a Function Report describing the effects of his degenerative disc disease.  He stated that he had trouble standing for more than 30 minutes at a time and had difficulty climbing stairs. He could walk for less than a mile. The Plaintiff reported burning pain in his back and legs, as well as numbness and tingling in his hands and feet.  This affected his ability to sit for long periods of time. The Plaintiff also had lost control of his bladder and bowels.  His wife helped him with personal care and he was unable to do any household chores.  The Plaintiff experienced depression and could not go out alone because of his seizures.  He related that he needed help understanding spoken and written instructions. (R: 262, 267-70)

On August 2, 2017, the Plaintiff presented to the emergency department of Memorial Hospital, Pembroke Pines, Florida as the result of seizures.  The Plaintiff reported that he was compliant with his Keppra medication regime.  His past medical history included diagnoses for alcoholism, back pain, cirrhosis and seizures.  The Plaintiff reported using marijuana and alcohol in the past, but stated that he had been "clean" for the preceding two months.  Physical examination yielded normal results, with some cervical paraspinal tenderness to palpation.  He displayed full range of motion and no seizure activity was witnessed in the emergency room.  The Plaintiff was given 1 gram of Keppra IV and Valium for his neck spasm.  He was discharged the same day. (R:578-85)

On August 7, 2017, the Plaintiff presented to Harold S. Williams, M.D., for a follow-up after his visit to the emergency department and to establish primary care. Physical examination, including musculoskeletal examination yielded normal results. Psychiatric examination showed intact recent and remote memory, with normal judgment, insight, attention span and concentration. Dr. Williams noted a history of seizures that the Plaintiff reported had become more frequent. The doctor discussed with the Plaintiff the relationship between his alcohol intake and seizures and advised the Plaintiff to stop all intake of alcohol. He referred the Plaintiff to a neurologist. (R:602)

On August 28, 2017, the Plaintiff presented to Andres M. Kanner, M.D., a neurologist. Dr. Kanner noted that the Plaintiff had a history of alcoholism, with generalized tonic-clonic (GTC) seizures beginning in 2012. The Plaintiff reported having one seizure per year until 2015, when he had 4-5 seizures. Since that time, the seizures had increased in frequency. The Plaintiff was taking levetiracetam (Keppra) at the maximum dose. He stated that he experienced depression, but had never been treated for this condition. The Plaintiff related that several members of his family suffered from alcoholism and depression. (R:651)

Dr. Kanner's physical examination yielded normal results. The Plaintiff had full range of motion and muscle strength, with a normal gait, although he complained of chronic low back pain. The doctor noted that the Plaintiff was not improving with the maximum dose of levetiracetam and that a change of medication was in order. He recommended a video-EEG monitoring study and a brain MRI to ascertain the nature of the Plaintiff's seizure disorder. Dr. Kanner instructed the Plaintiff to avoid driving, climbing ladders and roofs and taking baths. (R:651-53)

An EEG monitoring study of the Plaintiff was conducted between August 31 and September 3, 2017, at the University of Miami Hospital.  The Plaintiff reported that two weeks earlier he had experienced seizures every day for a week.  During one of these seizures the Plaintiff fell in his driveway, resulting in a head injury which caused him to seek treatment. The Plaintiff also reported past use of marijuana and cocaine, and a history of depression.  At the time of the study, the Plaintiff was drinking 4 beers per day, sometimes with an additional glass of wine, to prevent seizures from alcohol withdrawal.  While in the hospital, beer was unavailable and Ativan was ordered to treat alcohol withdrawal, but was not needed.  Levetiracetam was discontinued in an effort to capture seizures.  The study yielded normal results while Plaintiff was awake and asleep, with no epileptiform activity observed.  The plan was to wean the Plaintiff off levetiracetam and continuation of treatment with Dr. Kanner. (R:609-610)

On October 10, 2017, a Mental Residual Functional Capacity Assessment was completed by James L. Meyers, Psy.D., a state agency non-examining psychologist. Dr. Meyers found that the Plaintiff had no limitations in the areas of understanding and memory; sustained concentration and persistence; social interaction, and adaptation.  Dr. Meyers opined that the Plaintiff  retained the ability to perform simple, repetitive tasks, and likely had abilities to perform tasks at higher levels.  He was able to meet the basic mental demands of work on a sustained basis.  (R:119-120)

Also on October 10, 2017, a consultative psychological examination of the Plaintiff was performed by Lori Ben-Ezra, Ph.D.  On mental status examination, the Plaintiff was oriented in all spheres; affect and motor activity were appropriate; speech was spontaneous, organized and adequately articulated; fund of information was limited; he possessed the ability to use abstract reasoning; his responses showed

5

an ability to concentrate and attend to simple, rote stimuli, and short-term memory was mildly impaired.  The Plaintiff's performance suggested difficulty learning and implementing directions to complete complex tasks, but the ability to learn and remember directions to complete simple, repetitive tasks.  The Plaintiff did not exhibit a formal thought disorder and did not appear to be actively psychotic.  He was able to behave in a predictable manner and exhibit appropriate social judgments, and could engage in appropriate relationships with co-workers, supervisors and customers. (R:643-44)

The Plaintiff told Dr. Ben-Ezra that he had received no mental health treatment other than participation in a 2-day detox program earlier in the year at Memorial Regional Hospital, followed by three months of outpatient substance abuse treatments.  He described a significant history of alcohol and drug abuse, with several related arrests, but no prolonged incarceration.  The Plaintiff stated that he was able to do "odd jobs," care for his personal hygiene, cook and complete household chores.  Dr. Ben-Ezra found that the Plaintiff had presented to her with mild, sub-clinical depression related to changes in the Plaintiff's physical condition, although it was unclear the degree to which being only 2 months clean and sober impacted his emotional state.  She diagnosed alcohol and cannabis use disorder in early sustained remission.  (R:644)

On October 24, 2017, a Physical Residual Functional Capacity Assessment of the Plaintiff was performed by Andrew Scanameo, M.D., a state agency non-examining physician.  Dr. Scanameo assessed that the Plaintiff could lift and push/pull 20 pounds occasionally and 10 pounds frequently; could stand/walk or sit for about 6 hours during an 8-hour workday, and had an unlimited ability to push and/or pull within weight restrictions.  He could frequently climb ramps/stairs, kneel, crouch and

crawl; occasionally balance and stoop, and never climb ladders/ropes/scaffolds. The Plaintiff had no manipulative, visual or communicative limitations, and his only environmental limitation was the need to avoid all exposure to hazards, such as machinery and heights. The doctor noted that the Plaintiff was non-compliant with medical instructions to avoid alcohol use. (R:117-119)

Also on October 24, 2017, the Plaintiff returned to Dr. Kanner for neurological follow-up. Dr. Kanner noted that the EEG monitoring study had shown no epileptiform activity and that the Plaintiff had been started on lacosamide, while continuing on levetiracetam. The Plaintiff reported that he had not had any seizures since he began taking lacosamide. The Plaintiff complained of chronic low back pain, not radiating to his lower extremities; numbness in both hands and right thigh; depression, and insomnia. Physical examination, including range of motion, strength, muscle tone and gait yielded normal results. Dr. Kanner's plan was to increase the Plaintiff's dosage of lacosamide while decreasing levetiracetam. The doctor also recommended an antidepressant or cognitive behavioral therapy, but the Plaintiff wished to postpone such treatment because he was going to be in Georgia for several months. An MRI of the Plaintiff's brain performed on November 14, 2017, revealed a mild asymmetric enlargement of his right temporal lobe, but no significant abnormalities. (R:646-48, 723)

Also on November 14, 2017, the Plaintiff returned to Dr. Williams for a primary care follow-up examination for seizures and possible alcohol liver disease. The Plaintiff reported that he recently had completed a 3-month outpatient program for alcohol abuse and that he currently drank no more than 3 beers daily. The Plaintiff also reported that he had not had a seizure since before his last visit to the doctor in August 2017. He admitted that prior to that time he had not been taking his seizure

medication as prescribed.  Physical examination showed normal results, including gait and station, stability, muscle strength, muscle tone and range of motion.  Dr. Williams assessed that the absence of seizures for 6 months likely was related to lack of alcohol abuse and compliance with medication regimen.   He encouraged the Plaintiff to discontinue all use of alcohol.  (R:761-64)

On January 9, 2018, the Plaintiff presented to the Albany Vascular Specialist Center for follow-up after carotid and leg ultrasounds had been conducted. Musculoskeletal examination yielded normal results, but the examiner's assessment included arteriosclerosis of the native artery of each lower extremity, with intermittent claudication; numbness and tingling of leg; anaesthesia and paresthesia of skin; tobacco use disorder; obesity, and arterial insufficiency.  A bilateral duplex scan of the Plaintiff's carotid arteries was ordered. (R:812-15)

On January 12, 2018, the Plaintiff presented to Phoebe Emergency Center in Albany, Georgia for seizure medication.  He was instructed to seek follow-up and re-examination by his treating physician.  Radiographs of the Plaintiff's lumbar spine performed on January 29, 2018, showed no abnormalities other than moderate anterolisthesis at L5 onto S1.  (R:791-94)

On February 14, 2018, the Plaintiff completed a Supplemental Seizures Questionnaire in which he reported 6 seizures during the preceding 6 months.  The Plaintiff stated that he drank 4 cans [presumably of beer] per day.  The Plaintiff stated that his seizures lasted 2-3 minutes.   (R:291)

On February 15, 2018, a Psychiatric Review Technique Form pertaining to the Plaintiff was performed by Jeffrey Prickett, Psy.D., a state agency non-examining psychologist. Dr. Prickett determined that the Plaintiff suffered from Substance Abuse Addiction Disorder (alcohol), as well as Depressive, Bipolar and Related Disorders.  As

a result, the Plaintiff had mild limitations in the abilities to interact with others and to adapt or manage himself, and moderate limitations in the abilities to understand, remember or apply information and to concentrate, persist or maintain pace. Dr. Prickett opined that the Plaintiff was capable of performing simple repetitive tasks, work at an appropriate pace, complete tasks in a timely manner and sustain a routine with no more than mild limitations in concentration. (R:135-37)

Also on February 15, 2018, Phillip Matar, M.D., a non-examining state agency physician completed a Physical Residual Capacity Assessment of the Plaintiff. Dr. Matar opined that the Plaintiff could lift and push/pull 20 pounds occasionally and 10 pounds frequently; could stand/walk or sit for about 6 hours during an 8-hour workday, and had an unlimited ability to push and/or pull within weight restrictions. He could frequently climb ramps/stairs, kneel, crouch and crawl; occasionally balance and stoop, and never climb ladders/ropes/scaffolds. The Plaintiff had no manipulative, visual or communicative limitations, and his only environmental limitation was the need to avoid all exposure to hazards, such as machinery and heights. The doctor noted that the Plaintiff continued to drink alcohol, and that in the absence of alcohol use, the Plaintiff's seizure disorder was expected to improve. (R:137-40)

On the same day, Cassandra Rhodes Robinson, the Plaintiff's ex-wife, completed a Third Party Function Report pertaining to the Plaintiff. Ms. Robinson stated that the Plaintiff complained of pain all over his body and suffered from seizures which caused memory loss. The Plaintiff was able to feed Ms. Robinson's dog, but she walked the dog and took the pet to the veterinarian. The Plaintiff sometimes had difficulty dressing and bathing himself because of pain, but he could feed himself, use the toilet, fold clothes after Ms. Robinson washed them and shop for small items in stores. Ms. Robinson had to remind the Plaintiff of when to take his medications. The Plaintiff

was unable to stand for long periods of time and could not drive a car as a result of seizures.  (R:293-96)

Ms. Robinson opined that the Plaintiff could lift no more than 15 pounds and experienced severe pain when standing, bending or reaching.  He could walk for no more than 10 minutes, after which he would have to rest for 15 minutes, and he could pay attention for 2-5 minutes.  Ms. Robinson stated that the Plaintiff could not understand written instructions without assistance and it was difficult to make him understand spoken instructions.  He was afraid to sleep alone because of the possibility that he would have a seizure. Ms. Robinson also completed a Third Party Supplemental Seizure Questionnaire in which she stated that the Plaintiff had experienced 6 seizures during the preceding 6 months. (R:298-99, 301)

On March 28, 2018, Dr. Reinfeld  completed a Physical Medical Source Statement pertaining to the Plaintiff.  Dr. Reinfeld stated that his first contact with the Plaintiff was on November 20, 2011. The doctor's diagnoses included hypertension, hyperlipidemia, syncope and coronary artery disease.  The Plaintiff's prognosis was poor, as he would have more difficulty with activities of daily living owing to pain and comorbidities.  The Plaintiff experienced deep, throbbing pain from his back down to his right leg, as well as numbness and tingling in the right leg.  The Plaintiff's symptoms, which had lasted or could be expected to last for at least 12 months, were exacerbated by depression and anxiety.  (R:795)

Dr. Reinfeld opined that the Plaintiff could sit for 5 minutes at a time, stand for 10 minutes at a time and stand/walk for less than 2 hours.  The Plaintiff needed a job that permitted shifting positions, and he was required to walk for 10 minutes every 5

minutes.[1] The Plaintiff would need to take unscheduled breaks every working day, and had to elevate his legs above his heart with prolonged sitting. The doctor assessed that the Plaintiff could never lift anything weighing 10 pounds or more; could rarely twist, stoop/bend, crouch/squat or climb stairs; could never climb ladders, and had significant limitations in reaching, handling and fingering. The Plaintiff would be off task at least 25% of the time and likely would be absent from work more than 4 days per month. He would be capable of work only at a low stress level. (R:796-98)

On June 5, 2018, the Plaintiff presented to the emergency department of Phoebe Putney Memorial Hospital in Albany, Georgia, complaining of low back pain radiating to both legs. The Plaintiff reported being a daily smoker, but denied any use of alcohol or drugs. On physical examination, the Plaintiff had full range of motion in his back and all extremities, but he exhibited paraspinal tenderness in the lower lumbar area. Straight leg raise was positive bilaterally. The Plaintiff was assessed with seizure disorder and chronic low back pain. He was given prescriptions for diazepam and prednisone. (R:896-900)

On October 8, 2018, the Plaintiff presented to Kalpesh Patel, M.D., a neurologist at the Albany Neurology and Headache Center in Albany, Georgia for treatment of his seizure disorder. The Plaintiff reported that he takes 1 gram of Keppra twice daily and drinks regularly. The Plaintiff was taking his medication as directed and had experienced no new seizures during the course of treatment. The Plaintiff also complained of numbness and tingling in both hands and feet. During physical examination, Dr. Patel noted that the Plaintiff used a walker and had muscle strength of 4/5 in his lower extremities. Dr. Patel determined to continue treating the Plaintiff

---

[1] Dr.Reinfeld likely meant to state that the Plaintiff needed to walk for 10 minutes five times per workday. (R: 796)

with Keppra.  He noted that the Plaintiff's peripheral neuropathy appeared to be alcoholic neuropathy and strongly advised the Plaintiff to quit drinking.  Neurontin was prescribed for this condition.  (R:970-72)

On October 15, 2018, the Plaintiff returned to Dr. Patel for follow-up.  Dr. Patel noted that an EMG performed on the Plaintiff showed mild neuropathy.  Physical examination revealed no changes from the previous visit and Dr. Patel's recommendations remained the same.  On  November 13, 2018, an MRI of the Plaintiff's brain (ordered by Dr. Patel on the Plaintiff's request) showed a suspected mild, incomplete form of closed lip schizencephaly in the right hemisphere; subtle signal changes in the left hippocampus, which could indicate mild mesial temporal sclerosis on that side, and mild atrophy of the superior cerebellar vermis, which can be seen with chronic utilization of seizure medication. (R:967-69, 825-26)

On October 18, 2018, the Plaintiff presented to Heather Johnson, a nurse practitioner at Phoebe Neurological Associates in Albany, Georgia. Physical examination revealed that the Plaintiff's motor strength and tone were normal; movement in all extremities was normal; muscle strength was 5/5 throughout; straight leg raising was negative; gait and station, tiptoe, heel walk and tandem gait all were normal.  The Plaintiff did experience pain and tenderness in the lumbar spine, as well as decreased pinprick sensation in distal lower extremities.  Ms. Johnson started the Plaintiff on exercises and planned to obtain lumbar X-rays.  (R:981-82)

The Plaintiff returned to Dr. Patel for follow-up on November 15, 2018.  Dr. Patel noted the MRI results showing schizencephalic involved vermis, as well as the Plaintiff's regular drinking.  Examination results and recommendations were the same as on prior visits.  (R: 963-65)

On December 4, 2018, the Plaintiff returned to the emergency department of Phoebe Putney Memorial Hospital complaining of numbness in both feet and bilateral leg cramping.  The Plaintiff acknowledged smoking cigarettes daily and drinking beer.  Physical examination yielded normal results except for tenderness in the right calf and decreased sensation in both feet.  The Plaintiff had full range of motion and there was no tenderness to palpation in any area of his spine.  The Plaintiff stated that he did not need any medication for pain.  A bilateral lower extremity ultrasound was negative for deep vein thrombosis and the Plaintiff's potassium and magnesium levels were normal.  The Plaintiff was discharged with instructions to return to his primary care provider for re-evaluation.  (R:839-43)

Also on December 4, 2018, the Plaintiff presented to Michel Pare, M.D., a neurosurgeon at Phoebe Neurological Services for evaluation upon referral by Dr. Patel.  The Plaintiff complained of back pain with numbness in his hands and feet.  Physical examination yielded normal results and the Plaintiff was neurologically intact.  Dr. Pare determined to have the Plaintiff return after an MRI had been performed. (R:976-78)

The Plaintiff returned to Dr. Patel on December 6, 2018.  Physical examination once again was normal except for 4/5 muscle strength in the lower extremities.  Dr. Patel continued the Plaintiff on Keppra and Neurontin, and once again strongly advised him to quit drinking alcohol.  (R:960-62)

On December 10, 2018, the Plaintiff presented to Joe H. Morgan, M.D. at Albany Vascular Specialist Center for a vascular surgery evaluation.  The medical record reflects that the Plaintiff was referred by his primary care provider, Chimenzie Nlewem, D.O.  The Plaintiff complained of foot pain and numbness in his feet and legs.  The Plaintiff's past medical history included tobacco use disorder but not alcohol abuse.

13

The Plaintiff denied experiencing anxiety or depression and ambulated without difficulty. Dr. Morgan assessed atherosclerosis of native artery in both lower extremities with intermittent claudication; numbness and tingling of leg; anesthesia and paresthesia of skin; tobacco use disorder; obesity, and arterial insufficiency. Dr. Morgan ordered smoking and tobacco use cessation and counseling; an arterial Doppler ultrasound of both lower extremities; a bilateral duplex scan of the carotid arteries, and a motor nerve conduction study. (R:830-33)

On December 18, 2018, an MRI of the Plaintiff's lumbar spine revealed degenerative disc disease throughout the L-spine, greatest at the L4-L-5 level; Modic type II degenerative endplate chages at multiple levels; T12-L1 tiny disc bulge with no nerve contact; L2-L3 broad-based disc bulge mildly to moderately flattening the thecal sac; L3-L4 broad-based disc bulge and left paracentral disc protrusion moderately flattening the thecal sac and contacting the left L4 nerve root within the canal, displacing it posteriorly; L4-L5 broad-based disc bulge, contacting both L5 nerve roots within the canal, without displacement, and L5-S1 with no nerve root contact. (R:810-811)

On January 9, 2019, the Plaintiff returned to Dr. Morgan for vascular follow-up. The Plaintiff was experiencing no new problems. Dr. Morgan's assessment remained the same. He ordered a bilateral duplex scan of the Plaintiff's carotid arteries, and instructed the Plaintiff to call or return if symptoms worsened or persisted. (R:812-15)

Also on January 9, 2019, the Plaintiff returned to Dr. Patel for neurology follow-up relating to seizures. Dr. Patel noted that the Plaintiff had not experienced any seizures during the course of treatment and that his medications included levetiracetam. The Plaintiff denied all symptoms and his compliance with treatment had been good. He was a current smoker (one pack per day) and regular alcohol

drinker.  Physical examination revealed muscle strength at 5/5 in all major muscle groups, sensation was intact and gait and station were stable.  Dr. Patel's assessment was localization-related symptomatic epilepsy and epileptic syndrome with complex partial seizures, not intractable, without status epilepticus; seizures, and low back pain.  The Plaintiff was to continue with Keppra and Neurontin.  (R:957-59)

On January 22, 2019, nerve conduction studies of the Plaintiff's lower extremities showed severe distal symmetrical sensorimotor peripheral polyneuropathy, likely representing axonal type consistent with metabolic or toxic process, such as diabetes or alcohol abuse, and no evidence of lumbosacral radiculopathy.  (R:806-808)

On January 29, 2019, the Plaintiff returned to Dr. Pare for neurology follow-up on back pain and numbness in hands and feet.  Neurological examination revealed no changes.  Dr. Pare assessed low back pain.  Plan was back care and preventing injuries, getting back to normal after low back pain and learning about relief for low back pain.  (R:973-975)

On February 26, 2019, the Plaintiff presented to John D. Rowlett, M.D. at the emergency department of St. Joseph's/Candler Health System in Savannah, Georgia, complaining of back pain.  Dr. Rowlett noted that the Plaintiff was a user of tobacco and alcohol.  Physical examination revealed full range of motion in neck and extremities, with mild bilateral paraspinal tenderness.  The Plaintiff requested imaging and a shot. Intramuscular hydromorphone was administered and the Plaintiff was given prescriptions for hydrocodone and meloxicam, as well as methocarbomal for muscle spasm.  Dr. Rowlett's diagnoses were acute exacerbation of chronic back pain and tobacco abuse.  (R:999-1004)

On February 28, 2019, Dr. Nlewem completed a Seizures Medical Source Statement.  He stated that the Plaintiff suffered from convulsive (grand mal or

psychomotor) seizures with loss of consciousness.  The Plaintiff did not always have warning of seizure onset and could not always take safety precautions.  Occasionally the Plaintiff lost bladder and bowel control.  After a seizure, the Plaintiff experienced confusion, as well as muscle strain and exhaustion, and needed to rest for 1-2 hours. Dr. Nlewem did not identify any positive test results.  He stated that stress could precipitate seizures and the Plaintiff was capable of only low stress work.  Exertion also could precipitate seizures, with the result that the Plaintiff could only sit or stand/walk for less than 2 hours.  (R:1025-27)

Dr. Nlewem did not provide information in response to questions regarding the Plaintiff's ability to lift/carry; the types of medications taken and the Plaintiff's response; compliance with medications; side effects of medications, and whether the Plaintiff abused alcohol or street drugs.  Dr. Nlewem did state that the Plaintiff suffered from depression.  Also, the Plaintiff would need to take unscheduled breaks and would have good days and bad days.  However, the doctor did not state how often the Plaintiff would need breaks, how long the breaks would need to be or the reasons for the breaks.  The doctor also did not state how many days per month the Plaintiff would need to be absent from work, and did not list any additional limitations. (R:1027-28)

On February 28, 2019, Dr. Nlewem completed a Medical Assessment of Ability to Do Work Related Activity (Mental) and a Medical Assessment of Ability to Do Work Related Activity (Physical).  In the mental assessment, the doctor stated that the Plaintiff had fair abilities to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; deal with work stress, and function independently, but had a poor or no ability to maintain attention/concentration.  The Plaintiff had a fair ability to understand, remember and carry out complex job

16

instructions, but good abilities to understand, remember and carry out simple and detailed, but not complex job instructions.  Dr. Nlewem explained that the Plaintiff's seizure disorder had affected his attention and memory.  The Plaintiff had good abilities to maintain personal appearance; behave in an emotionally stable manner; relate predictably in social situations, and demonstrate reliability.  Dr. Nlewem stated that the Plaintiff suffered from a schizophrenic, paranoid or other psychotic disorder and a substance addiction disorder.  The Plaintiff did not have an affective disorder.  The doctor stated that the Plaintiff's seizures and schizophrenia were material to his disability.  (R: 1029-31)

In the physical assessment, Dr. Nlewem stated that  he saw the Plaintiff every 8 months, but did not specify the length of his contact with the Plaintiff.  The doctor diagnosed the Plaintiff with seizures, schizophrenia and chronic back pain, with a fair prognosis.  He rated the Plaintiff's back pain as 10 on a scale of 10 without medication, and stated that the Plaintiff suffered from headaches after seizures.  Emotional factors affecting the Plaintiff's physical condition included depression and anxiety.  Dr. Nlewem opined that the Plaintiff needed to elevate his legs after prolonged sitting for 31-40% of an 8-hour workday as the result of pain in his lower extremities.  He also needed to use a cane for standing/walking as the result of imbalance, insecurity and weakness.  (R:1033-34)

Dr. Nlewem assessed that the Plaintiff could lift and carry less than 10 pounds rarely; could rarely twist, stoop (bend) or crouch/squat and could never climb ladders, and had significant limitations with reaching, handling or fingering (without specification of the percentage of time the Plaintiff could use his hands and arms for various activities).  In a typical 8-hour workday, the Plaintiff could sit or stand/walk for 15 minutes at a time and for less than 2 hours total.  The Plaintiff needed a job that

permitted shifting positions at will, and had to walk around every 15 minutes (without specification of how long the Plaintiff needed to do this).    The Plaintiff would be required to take unscheduled breaks for 15-20 minutes every 15-20 minutes as the result of muscle weakness, chronic fatigue and pain. (R:1034, 1036)

The doctor estimated that the Plaintiff would be off-task because his symptoms would interfere with attention and concentration for 5% of a typical workday, and stated that the Plaintiff was capable of low-stress work.  He believed that the Plaintiff had good days and bad days and likely would be absent from work more than 4 days per month.  The Plaintiff's impairments as demonstrated by clinical findings were reasonably consistent with the symptoms described by Dr. Nlewem in the assessment, and the Plaintiff had no other visual, psychological, hearing or environmental limitations.  (R:1035)

At the administrative hearing, the Plaintiff testified that he was living with his mother in Albany, Georgia and stayed with his ex-wife when in Miami.  He stated that from 1990 to 2003, he was employed as a longshoreman at the Port of Miami. Beginning in 2004, the Plaintiff worked as a custodian at a warehouse.  In 2007, he was injured when he fell two stories from a scaffold.  He fell face down onto concrete and hit his head, and was in the hospital for two or three days.   The Plaintiff did not break bones, but the fall did result in back pain.  After his injury, the Plaintiff took a job with a roofing company for 4 years.  He left that job because the pain prevented him from continuing.  He did not try to get a less physical job because he had not graduated from high school and did not know how to do anything else.  The vocational expert (VE) classified the Plaintiff's janitorial job as medium with an SVP of 2 and his roofing job as very heavy, also with an SVP of 2. (R:42-49, 51)

The Plaintiff testified that he did not drive because of his seizures. He used a cane, which had been prescribed by Dr. Reinfeld because back pain prevented him from standing for long. The Plaintiff stated that he had seizures every 8-9 days, during which he passed out and woke up with a headache. He had been taking seizure medication for about 3 years. The Plaintiff told the ALJ that he was not taking any antidepressant or anti-anxiety medication because of his seizure medication. Dr. Nlewem, the Plaintiff's primary care physician, had not prescribed any medications for depression or anxiety. The Plaintiff also stated that he no longer drank alcohol or smoked marijuana. (R: 49, 54, 57, 62, 64, 67)

The Plaintiff related that he had been to a hospital emergency room in Savannah, Georgia three weeks earlier as the result of back pain and had been given an injection. He explained that he had received 3 or 4 injections in the preceding 4 years, which provided relief for a couple of days. The Plaintiff was not sure if he had cirrhosis of the liver, but knew he had been checked for that condition. (R:69-70)

The ALJ asked the VE to consider a hypothetical individual with the Plaintiff's age, education and work experience who was limited to light work, except that the individual could only occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand/walk or sit for 6 hours in an 8-hour workday; had no limitations other than weight restrictions in pushing/pulling; could frequently kneel, crouch by bending at the knees, crawl, and climb ramps, stairs, ladders ropes and scaffolds; could occasionally stoop by bending at the waist, and needed to avoid all exposure to hazards such as machinery and heights. The individual was limited to unskilled, unspecific vocational preparation (an SVP level of 1 or 2) in occupations which involve simple, routine and repetitive tasks, with only frequent interactions with the public, co-workers and supervisors and only frequent work setting changes. The VE testified

that such a person could not do the Plaintiff's past relevant work, but could perform jobs that exist in significant numbers in the national economy, each of which is classified as light work with an SVP of 2:  linen supply load builder, order caller and fund raiser.  However, if such an individual were to be absent at least 2 days per month outside of normal leave owing to frequent seizures or to miss work 20 minutes an hour outside of normal breaks, that person would be unable to perform any work. (R:71-73)

The VE testified that if the hypothetical individual needed to use a cane occasionally, he could not perform the job of linen supply load builder, but could perform the job of information clerk (light, SVP 2).  The VE further testified that everything about which she had testified was  consistent with DOT.  She added that her testimony relating to an individual who needed frequent breaks or would be absent at least 2 days per month was based on Census information, Department of Labor Bureau of Labor Statistics and her observations in the field.  (R:74-75)

## III. <u>DECISION OF THE ALJ</u>

The ALJ first found that the Plaintiff had not engaged in any substantial gainful activity since his application date of March 14, 2017; had the severe impairments of spine disorders, degenerative disc disease, epilepsy, substance abuse disorder (alcohol and cannabis), and depressive, bipolar and related disorders, and did not have any impairment or combination of impairments which met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Regarding listed impairments, the ALJ noted that although the Plaintiff had degenerative disc disease, he did not have the requisite inability to ambulate effectively or neurological deficits.

Similarly, although the Plaintiff had epilepsy, his seizures were not characterized by the requisite elements of frequency and severity. (R:19-20)

As to the Plaintiff's mental impairments, the ALJ determined that the Plaintiff had mild limitations in the areas of interacting with others and of managing himself, and moderate limitations in the areas of understanding, remembering and applying information and of concentrating, persisting and maintaining pace. Since the Plaintiff did not have marked limitations in at least two areas or an extreme limitation in one area, his mental impairments did not meet or medically equal a listing. Additionally, the Plaintiff did not have a "marginal adjustment" (a minimal capacity to adapt to changes in his environment or to demands that were not already a part of his daily life) and was able to function independently. Finally, no state agency psychological consultant had concluded that the Plaintiff's mental impairment met or equaled a listing. (R:20)

The ALJ next determined that the Plaintiff had the residual functional capacity to perform light work, except that he could only frequently kneel, crouch, crawl, climb ramps, stairs, ladders, ropes and scaffolds; could occasionally balance and stoop, and had to avoid all exposure to hazards, such as machinery and heights. Additionally, the Plaintiff was limited to unskilled SVP levels 1 and 2 occupations involving simple, routine and repetitive tasks. He further was limited to frequent interaction with the public, co-workers and supervisors and frequent work setting changes, and occasionally would use a cane to ambulate. After briefly summarizing the Plaintiff's hearing testimony, the ALJ found that the Plaintiff's medically determinable impairments reasonably could be expected to cause his alleged symptoms, but his statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence of record.

According to the ALJ, the Plaintiff's subjective allegations were contradicted by the objective findings. (R:21-22)

After summarizing the medical evidence, as well as the reports submitted by the Plaintiff and his ex-wife (R:22-24), the ALJ concluded that the opinions of the state agency medical and psychological consultants supported a finding of "not disabled." The ALJ noted that consultative psychological examiner Dr. Ben-Ezra assessed that the Plaintiff would have difficulty learning and implementing directions to complete complex tasks, but should be able to learn and remember directions to complete simple, repetitive tasks.  The ALJ accorded partial weight to the opinions of state agency psychologists Dr. McCallister and Dr. Meyers, but found that the Plaintiff had more limitations as the result of depression and anxiety than were found by these consultants.  However, the ALJ noted that the Plaintiff had declined medication for his mental symptoms.  The ALJ accorded great weight to the opinions of state agency psychologist Dr. Pricket and Dr. Ben-Ezra because their assessments were consistent with the evidence of record, including the Plaintiff's limited history of mental health treatment.   The ALJ emphasized that the Plaintiff  consistently was oriented to person, place and time; his judgment, insight, attention span and concentration all were normal, and his recent and remote memory were intact.  (R:24-25)

The ALJ also gave great weight to the opinions of the state agency medical consultants as consistent with the medical evidence of record.  The ALJ noted that the Plaintiff's gait regularly was observed as normal; straight leg raising was negative bilaterally; he had full range of motion of all extremities; motor strength was normal, and he was neurologically intact.  The ALJ assigned little weight to the opinions of Dr. Reinfeld and Dr. Nlewem as inconsistent with these clinical findings, except to the extent that the Plaintiff needed a cane to assist with ambulation.  The ALJ pointed out

that the Plaintiff's daily activities had continued and he was able to function independently. Although the Plaintiff did have a history of seizure episodes, his seizure activity had improved with treatment. The Plaintiff received only routine conservative treatment for his complaints of chronic back and leg pain. (R:25-26)

As to the Plaintiff's psychological symptoms, there was no evidence to support the Plaintiff's hearing testimony that he could not take psychiatric medication because of his seizure medication. The Plaintiff's substance abuse disorder appeared to have improved and remained stable, and there was limited evidence of any mental health treatment. The ALJ concluded that the residual functional capacity articulated in his decision was supported by some of the Plaintiff's own subjective allegations, his activities of daily living, the routine and conservative history of treatment, the objective evidence and the record as a whole. (R:26)

The ALJ next found that the Plaintiff was unable to perform any of his past relevant work as a warehouse cleaner and roof helper. However, based on the Plaintiff's residual functional capacity and the testimony of the VE, there were jobs existing in large numbers in the national economy that the Plaintiff could perform, such as order caller, fund raiser and information clerk. Therefore, the Plaintiff was not under a disability as defined by the Social Security Act since March 14, 2017, the date on which his application was filed.

## IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The Plaintiff seeks reversal or remand on three grounds: (1) the ALJ did not properly evaluate the Plaintiff's spinal disorders as not meeting Listing 1.04; (2) the ALJ did not articulate good cause for failing to give controlling weight to the opinions

of the Plaintiff's treating physicians, and (3) the ALJ failed to resolve conflicts between his residual functional capacity assessment and the DOT.

The Commissioner contends that the decision of the ALJ must be affirmed because it is supported by substantial evidence and the correct legal standards were applied.

## V. RECOMMENDATIONS OF LAW

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence. "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389 (1971); Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983). The Court must review the record as a whole to determine if the decision is supported by substantial evidence. Bloodsworth, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards. No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993) (citing Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987)).

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520. First the claimant must not be engaged in substantial gainful activity after the date the disability began. Second, the claimant must provide evidence of a severe impairment. Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis

proceeds to step four.  In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work.  The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five.  The ALJ must show that there is other gainful work in the national economy which the claimant can perform.  Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to  perform such work.

### A. Listing 1.04

The Plaintiff first contends that the ALJ did not properly evaluate his spinal impairment pursuant to Listing 1.04, 20 C.F.R. Part 404, Subpart P, Appendix 1, which in relevant part relates to:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)

The Plaintiff contends that while the ALJ referred only to degenerative disc disease, there was ample evidence in the record that the Plaintiff suffers from multi-level spinal stenosis, facet arthritis, herniated nucleus pulposus and bulging discs, thereby meeting the threshold requirement of a spine disorder.  The Plaintiff next contends that the medical evidence shows compromise of at least 5 nerve roots, the second requirement of Listing 1.04.  Finally, the Plaintiff argues that his spine disorder qualifies under Subsection A, dealing with nerve root compression.

25

In response, the Commissioner first points out that it is the Plaintiff's burden to demonstrate that he is disabled, in this case requiring him to produce evidence establishing that his condition meets or equals a listed impairment. See, Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir 2003). As summarized by the Eleventh Circuit,

> To "meet" a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement. To "equal" a Listing, the medical findings must be "at least equal in severity and duration to the listed findings." If a claimant has more than one impairment, and none meets or equals a listed impairment, the Commissioner reviews the impairments' symptoms, signs, and laboratory findings to determine whether the combination is medically equal to any listed impairment.

Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002) (citations omitted).

The Commissioner argues that even assuming that the Plaintiff had a disorder of the spine with nerve root compression, the Plaintiff has failed to provide sufficient evidence to demonstrate each of the characteristics set forth in Subsection A. The Commissioner points out that the medical record reflects no evidence of limitation in the Plaintiff's range of motion; evidence of only short-term loss of motor strength (4/5 in the lower extremities) only during the 3-month period of October to December 2018, and only a single instance of positive straight leg raising in June 2018. Otherwise, the physical examination results showed that the Plaintiff had full range of motion in his spine, 5/5 motor strength throughout and negative straight leg raising.

The ALJ specifically found that although the Plaintiff had degenerative disc disease, he did not have the requisite inability to ambulate effectively or neurological deficits. The ALJ also discussed in his decision all of the medical evidence pertinent to this determination. Under these circumstances, a mechanical recitation of all the evidence leading to the ALJ's determination that the Plaintiff's degenerative disc

disease did not meet or equal Listing 1.04 was not required.  See, Hutchinson v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986).  Accordingly, the ALJ did not err in rejecting the Plaintiff's claim that his disc disease met or medically equaled this listing.

## B. Opinions of Treating Physicians

The Plaintiff next contends that the ALJ erred by failing to articulate good cause for not giving controlling weight to the opinions of the Plaintiff's treating physicians, Dr. Reinfeld and Dr. Nlewem.  For claims filed before March 27, 2017, 20 C.F.R. § 404.1527(c)(2) provides that the treating source's medical opinion on the nature and severity of a claimant's impairments is given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  If the opinion of a treating source is not given controlling weight, the ALJ will consider other factors, such as supportability by medical signs and laboratory findings; consistency of the opinion with the record as a whole, and the source's area of specialization. 20 C.F.R. § 404.1527(c)(3)-(6).  The Eleventh Circuit consistently has held that the testimony of a treating physician must be given considerable weight unless "good cause" is shown to the contrary, and failure of the ALJ to clearly articulate the reasons for giving lesser weight to the opinion of a treating physician constitutes reversible error. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11ᵗʰ Cir. 1986); 20 C.F.R. §§ 404.157(d)(2), 416.927(d)(2)(1999).

In the instant case, the ALJ accorded little weight to the opinions of Dr. Reinfeld and Dr. Nlewem, the Plaintiff's primary care physicians in Florida and Georgia, respectively.  At the outset, the undersigned notes that the Plaintiff's Statement of Material Facts (ECF No. 26) makes no reference to any treatment record of either of

these two doctors.  The only mention of Dr. Nlewem, apart from his February 2019 assessments, is a reference to Dr. Nlewem's referral of the Plaintiff to Dr. Joe Morgan in December 2018.  Id. at 11.

In his decision, the ALJ's articulated basis for according little weight to the opinions of Dr. Reinfeld and Dr. Nlewem was the fact that these opinions were inconsistent with the collective observations of the other medical specialists who examined the Plaintiff.  The ALJ pointed out that the Plaintiff's gait regularly was observed as normal; straight leg raising was negative bilaterally; he had full range of motion of all extremities; motor strength was normal, and he was neurologically intact. The ALJ stated that the opinions of Dr. Reinfeld and Dr. Nlewem were inconsistent with these clinical findings, except to the extent that the Plaintiff needed a cane to assist with ambulation.  The ALJ also noted that the Plaintiff's daily activities had continued and he was able to function independently.  Although the Plaintiff did have a history of seizure episodes, his seizure activity had improved with treatment, and the Plaintiff received only routine conservative treatment for his complaints of chronic back and leg pain.

The ALJ's decision to reject the highly restrictive opinions of the Plaintiff's treating physicians is fully supported by the record, since their opinions are contradicted by the clinical records of the various specialists who treated the Plaintiff for his seizure disorder, as well as for his back and leg pain and numbness.  The undersigned also notes that Dr. Llewem diagnosed the Plaintiff with schizophrenia with no record evidence or diagnosis of this ailment by any mental health or other medical professional.  The undersigned concludes that the ALJ articulated good cause for failing to credit the opinions of Dr. Reinfeld and Dr. Nlewem, and no error was committed in this regard.

C. <u>Residual Functional Capacity</u>

The Plaintiff's final ground for relief is that the ALJ's assessment of the Plaintiff's residual functional capacity incorrectly found that the Plaintiff had the mental capacity to perform simple, routine repetitive tasks, while the opinion of state agency psychological consultant Dr. Prickett (to which the ALJ gave great weight) stated that the Plaintiff could understand, remember and carry out simple instructions.  The Plaintiff also argues that there is a conflict between the ALJ's residual functional capacity assessment of the Plaintiff's mental capabilities and the DOT descriptions of the jobs the VE listed as available to the Plaintiff.

As to the difference in wording between the ALJ's residual functional capacity assessment and the opinion of Dr. Prickett, the Commissioner emphasizes that although the ALJ gave great weight to Dr. Prickett's opinion, the ALJ's assessment was based on all of the psychological evidence in the record.  Specifically, the ALJ noted that consultative psychological examiner Dr. Ben-Ezra assessed that the Plaintiff would have difficulty learning and implementing directions to complete complex tasks, but should be able to learn and remember directions to complete simple, repetitive tasks.  The ALJ accorded partial weight to the opinions of state agency psychologists Dr. McCallister and Dr. Meyers, but found that the Plaintiff had more limitations as the result of depression and anxiety than were found by these consultants.  However, the ALJ noted that the Plaintiff had declined medication for his mental symptoms.  The ALJ accorded great weight to the opinions of state agency psychologist Dr. Pricket and Dr. Ben-Ezra because their assessments were consistent with the evidence of record, including the Plaintiff's limited history of mental health treatment.  The ALJ pointed out that the Plaintiff consistently was oriented to person, place and time; his judgment, insight, attention span and concentration all were

normal, and his recent and remote memory were intact.  Based on the ALJ's reliance on the all of the psychological evidence of record, the undersigned finds that there was no error in the ALJ's residual functional capacity assessment resulting from the wording employed by Dr. Prickett.

The Plaintiff also contends that the ALJ erred by failing to resolve conflicts between the VE's testimony regarding jobs the Plaintiff could perform and DOT definitions of each of those jobs and its requirements, as mandated by Washington v. Comm'r of Soc.Sec., 906 F.3d 1353 (11th Cir. 2018).  In that case, the Eleventh Circuit construed the responsibility of the ALJ as governed by SSR 00-4p, 2000 WL 1989704:

> SSR 00-4p imposes a duty on ALJs to identify and resolve apparent conflicts between DOT data and VE's testimony, and this duty is not fulfilled simply by taking the VE at his word that his testimony comports with the DOT when the record reveals an apparent conflict between the VE testimony and the DOT.  Rather, as we see it, the ALJ has an affirmative obligation to identify any "apparent" conflict and to resolve it.  The failure to properly discharge this duty means the ALJ's decision is not supported by substantial evidence.

Id. at 1362.

The Plaintiff contends that there is an apparent conflict between the DOT definitions of the jobs identified by the VE because the DOT defines those jobs as requiring at least a reasoning level of 2, while the Plaintiff's residual functional capacity limited him to performing simple and routine tasks.  The DOT defines reasoning level 2 as requiring an individual to "[a]pply common sense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." Dictionary of Occupational Titles, Appendix C, 1991 WL 688702. The Eleventh Circuit recently ruled that this definition does not exclude individuals who are capable of performing simple, routine tasks.  Valdez v. Commissioner of Social Security, 808 F.

App'x 1005, 1009 (11th Cir. 2020) (individual limited to simple, routine work could perform jobs at reasoning levels 1 and 2).

Based on Valdez, the undersigned concludes that the ALJ was not required to resolve any conflict between the Plaintiff's ability to perform only simple, routine and repetitive tasks and the VE's identification of the job of order taker (reasoning level 2) as one Plaintiff could perform, since no conflict exists.  Since this job exists in significant numbers in the national economy, it is not necessary to determine whether the Plaintiff could perform the jobs of fund raiser (reasoning level 3) and information clerk (at reasoning level 4).  Id.

Accordingly, the Plaintiff has failed to establish any error committed by the ALJ, and the undersigned finds that the ALJ's decision is supported by substantial evidence in all respects.  Therefore, the Plaintiff  is not under a disability as defined by the Social Security Act.

## VI. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Plaintiff's Motion for Summary Judgment be DENIED, and the Commissioner's Motion for Summary Judgment be GRANTED.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with  the Honorable William P. Dimitrouleas, United States District Judge.  Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein,

except upon grounds of plain error if necessary in the interest of justice.  <u>See</u> 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985); <u>Henley v. Johnson</u>, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 26th day of January, 2021.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record